NOT DESIGNATED FOR PUBLICATION

No. 114,683

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MONICA WILLIAMS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed December 16, 2016. Conviction reversed, sentence vacated, and case remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., GREEN and LEBEN, JJ.

LEBEN, J.: Monica Williams entered a diversion agreement with the State that would have let her avoid a felony theft charge if she repaid money she had taken from a bank account set up to support a high school graduation party. When she didn't make the payments, the diversion agreement ended and her case proceeded to trial before a judge on facts she had agreed to in the diversion agreement.

Williams now appeals, contending that she never properly gave up her right to a jury trial. Our Supreme Court has said that a jury-trial waiver in a felony case can only be

made after the judge has personally advised the defendant of that right. *State v. Rizo*, 304 Kan. 974, 980, 377 P.3d 419 (2016). As the State concedes, while Williams said in the written diversion agreement that she was giving up her jury-trial right, there is no record that the district judge ever personally explained that right to her. Accordingly, we must set aside her conviction and send the case back for a jury trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Williams served as a co-chair for Project Graduation of Olathe North High School and was a co-signer on the bank account for the group, which was formed to raise money and put on a graduation party. When another member of the group went to close the account, she learned that the account had a negative balance and that Williams had written herself more than $12,000 in checks, taken $360 in cash from deposits, and paid approximately $200 in personal bills from the account. The State charged Williams in September 2010 with felony theft for stealing at least $1,000 but less than $25,000.

In July 2011, Williams entered into a diversion agreement with the State, in which the parties agreed that if she paid restitution and abided by other conditions, the State would dismiss the charges. Under the terms of the diversion agreement, Williams agreed to pay $610 per month to the Johnson County District Attorney's office until she had paid $12,861.81 in restitution. The agreement Williams signed also waived a number of important rights: "Defendant specifically waives all rights under the laws or Constitution of Kansas or of the United States to a speedy arraignment, preliminary examination and hearings, speedy trial, and a jury trial." Williams also agreed that if she violated the terms of the agreement, she would "stipulate to the charges and facts as they are contained in the affidavit, as well as any police and lab reports" that became available, and the case would "proceed to trial solely on the stipulations contained" in the affidavit and any later reports. Williams' term of diversion was initially set to last 24 months, ending in July 2013, but was later extended by agreement to end in July 2016 to give Williams

2

additional time to make restitution payments after she had suffered an accident and lost her job.

Even with the extension of time to make the payments, Williams failed to complete them. After notice by the State and a hearing (held in June 2014), the district court resumed the criminal case against her as provided for by statute. See K.S.A. 22-2911(a). Williams does not dispute on appeal that it was proper for the district court to resume proceeding in the criminal case against her.

Based on Williams' written waiver of her jury-trial right in the diversion agreement, the district court then held a bench trial (a trial before a judge rather than before a jury) and found Williams guilty of felony theft based on the stipulated facts in the diversion agreement.

At sentencing, the district court ordered Williams to nonreporting probation for a period of 12 months, but if she failed on probation, she would be required to serve 5 months in prison. By the time of the sentencing hearing, Williams had paid off all of the restitution.

Williams has appealed to this court. She makes two arguments on appeal. First, she contends that the evidence presented to the district court wasn't sufficient to prove her guilty of the offense charged. Second, she contends that she wasn't properly advised of her jury-trial right, making her waiver of that right ineffective. We will address these issues in reverse order.

ANALYSIS

I. *Williams' Waiver of Her Jury-Trial Right Was Ineffective Because the District Court Did Not Adequately Explain That Right to Her.*

Williams argues that the district court's failure to advise her of her constitutional right to a jury trial on the record requires reversing her conviction and remanding the matter to the district court. The State concedes that there's no indication in the record that the district court personally advised Williams about her right to a jury trial before accepting her waiver but argues that this case is distinct from previous cases and urges this court to reconsider the requirement that a defendant be personally advised by the court.

Since this issue was not initially raised in the district court, we must first discuss whether we may consider it. Generally, a party may not raise an issue, even a constitutional one, for the first time on appeal. *Rizo*, 304 Kan. at 978. But we may consider an issue not raised in the district court if "necessary to serve the ends of justice or to prevent the denial of fundamental rights." 304 Kan. at 978-79 (citing *State v. Anderson*, 294 Kan. 450, 464-65, 276 P.3d 200 [2012]). And Kansas courts have considered jury-trial-waiver issues for the first time on appeal to protect a defendant's fundamental right to a jury trial. See, *e.g.*, *Rizo*, 304 Kan. at 979; *State v. Frye*, 294 Kan. 364, 368-69, 277 P.3d 1091 (2012); *State v. Irving*, 216 Kan. 588, 588-89, 533 P.2d 1225 (1975); *State v. Johnson*, 46 Kan. App. 2d 387, 397, 264 P.3d 1018 (2011). So we will proceed to consider Williams' claim.

The Sixth Amendment to the United States Constitution and Sections 5 and 10 of the Kansas Constitution Bill of Rights guarantee a criminal defendant the right to a jury trial. A Kansas statute also provides a right to a jury trial in all felony cases. See K.S.A. 22-3403(3).

4

Although the right to a jury trial is an important one, it may be waived if done so voluntarily and knowingly. *Irving*, 216 Kan. at 589. "The test for determining the waiver's validity is whether it was voluntarily made by a defendant who knew and understood what he or she was doing." *State v. Beaman*, 295 Kan. 853, 858, 286 P.3d 876 (2012).

In *Irving*, the Kansas Supreme Court held that a court cannot accept a jury-trial waiver unless the defendant, after being advised *by the court* of his or her right to a jury trial, personally waives that right, either in writing or in open court on the record. 216 Kan. at 590. In several later cases, Kansas courts have reaffirmed this rule, holding that the district court must personally advise the defendant of his or her jury-trial right before the defendant may knowingly and voluntarily waive that right. See, *e.g.*, *Rizo*, 304 Kan. 974, Syl. ¶ 2; *Frye*, 294 Kan. at 371 (noting that "the responsibility to inform a defendant of his or her jury trial right rests squarely with the presiding judge"); *Johnson*, 46 Kan. App. 2d at 399 (concluding defendant's waiver of jury-trial right in a stipulation of facts was insufficient to waive that right when the record failed to establish that the district court had personally advised defendant about the right). In addition, our Supreme Court has held that a waiver of the jury-trial right will not be presumed from a silent record. *Irving*, 216 Kan. at 589.

The State contends that Williams knowingly and voluntarily waived her jury-trial right in the diversion agreement after being advised by her attorney of her right. But in *State v. Raikes*, 49 Kan. App. 2d 681, 682, 313 P.3d 94 (2013), our court held a jury-trial waiver provision in a diversion agreement was not sufficient to waive the defendant's right to a jury trial when the district court had never personally advised the defendant of his jury-trial right. The diversion agreement in the case provided that if Raikes did not successfully complete the drug-treatment program, "'there will be no other proceedings except for a trial to the court on stipulated facts.'" 49 Kan. App. 2d at 686. In determining that the diversion agreement was not a valid waiver, the *Raikes* court emphasized the

5

clear Kansas Supreme Court precedent recognizing the fundamental right to trial by jury and the specific steps that must be taken for a court to be satisfied that the defendant's waiver was knowing and voluntary—that is, that the court personally advise the defendant before the defendant waives his or her jury-trial right. 49 Kan. App. 2d at 688.

Our case fits squarely within this rule. Williams' waiver of her jury-trial right came in a single sentence of the diversion agreement, and there's nothing in our record to suggest that the district court ever personally advised Williams about that right. The State asks this court to reconsider the requirement that the district court personally advise the defendant of the jury-trial right. But we must follow Kansas Supreme Court precedent, absent an indication that it is changing its position. *State v. Shull*, 52 Kan. App. 2d 981, Syl. ¶ 2, 381 P.3d 499 (2016). Nothing indicates that the court is changing its position. Contrary to the State's argument, an explanation of the jury-trial right given by the defendant's attorney is not sufficient to satisfy the requirement under Kansas law that the district court personally advise the defendant of his or her jury-trial right.

Because the district court did not personally advise Williams of her jury-trial right, we must set aside the result of the trial held without a jury. We will remand the case back to the district court with directions that it afford Williams her constitutional right to a jury trial or secure a valid waiver of that right. See *Frye*, 294 Kan. at 374.

II. *The State Presented Sufficient Evidence to Support a Conviction for Felony Theft.*

Since a new trial is being ordered and we have set aside Williams' conviction, we would ordinarily be finished with the appeal. Here, though, there is an issue that could arise again when the case goes back to the district court: Did the evidence that Williams stipulated could be used at her trial provide sufficient evidence to convict her of felony theft? We will address that question because it will arise again on remand. See *State v. Hernandez*, 294 Kan. 200, 208-09, 273 P.3d 774 (2012).

On appeal, Williams argues that the State failed to present sufficient evidence to support her conviction for felony theft because it failed to establish that (1) Project Graduation was the "owner" of the money under the statutory definition of that term, (2) Williams' use of the money was unauthorized, and (3) the value of the money used by Williams on unauthorized purchases was at least $1,000. The State argues that because Williams stipulated to the facts and charges in the case, she has waived her ability to challenge the sufficiency of the evidence on appeal. Alternatively, the State contends that sufficient evidence supported Williams' conviction.

As a preliminary matter, the State maintains that Williams has waived any challenge to the sufficiency of the evidence because she stipulated to the "charges and facts as they are contained in the affidavit." In support of its argument, the State cites *State v. McCammon*, 45 Kan. App. 2d 482, 488-89, 250 P.3d 838 (2011). In *McCammon*, our court held that "[w]hen criminal defendants agree to stipulated facts without objection, they are precluded from arguing on appeal that the evidence was not sufficient to support the convictions if they conceded in the stipulation that the convictions were supported by sufficient evidence." 45 Kan. App. 2d at 488-89 (noting that defense counsel had told the district court that the facts in the affidavit were sufficient evidence to support a conviction). The State argues that by stipulating "to the charges and facts" in the affidavit, Williams essentially stipulated that sufficient evidence supports the charges.

But stipulating to charges is very different from stipulating that there is sufficient evidence to support a conviction, as happened in *McCammon*. While the defendant does stipulate in a diversion agreement to facts that may be used at trial in the event the diversion agreement is set aside—without having the same sort of personal explanation from the judge required to waive a jury trial, see *Rizo*, 304 Kan. at 981-82—we will not expand the waiver beyond its own terms. Williams merely stipulated that the facts in the

7

affidavit could be admitted against her at trial. Accordingly, we still must determine whether the evidence she stipulated to is sufficient to convict her of the charged offense.

To test the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution, even though a jury would not be required to do so. We must determine whether a rational factfinder could find the defendant guilty beyond a reasonable doubt. *State v. Dunn*, 304 Kan. 773, 821, 375 P.3d 332 (2016); see also *State v. Darrow*, 304 Kan. 710, 715, 374 P.3d 673 (2016) (reviewing court takes facts in light most favorable to the State even when facts were stipulated to and appellate court is in same position to review them as district court).

To convict a defendant of a crime, the State must prove each element of the crime beyond a reasonable doubt. *State v. Brown*, 303 Kan. 995, 1001, 368 P.3d 1101 (2016). In the context of this case, theft is obtaining or exerting unauthorized control over property with the intent to permanently deprive the owner of the possession, use, or benefit of the owner's property. K.S.A. 21-3701(a). The charging document provided:

> "That between the 19th day of June, 2009 and the 31st day of May, 2010 in the City of Olathe, County of Johnson, State of Kansas, MONICA L. WILLIAMS did then and there unlawfully, feloniously and willfully obtain or exert unauthorized control over property, to-wit: cash and/or checks, with the intention to permanently deprive the owner, to-wit: Olathe North High School Project Graduation of the possession, use or benefit of the property, of a value of at least $1,000.00 but less than $25,000.00."

Since the facts were presented through the charging affidavit, we will set out its contents as well so that the reader can review with us whether the facts set out there proved each element of the charge:

> "1. On June 7, 2010 Sarah Klisares contacted Olathe Police regarding a theft. She told officers that in May[] 2009 she agreed to co-chair Project Graduation for Olathe

8

High School along with the defendant, MONICA L. WILLIAMS. Both went to First National Bank of Olathe and became co-signers on the Project Graduation bank account. The account was supposed to be used to deposit all donations and pay for the school graduation party. In the fall of 2009, Klisares removed herself from the committee and did not participate in any activity; however, she did not remove her name from the checking account.

"2. Towards the end of May[] 2010 WILLIAMS told Klisares she went to the bank to close the account and suggested Klisares do the same. When Klisares did that, she was told by the bank that the account could not be closed due to a negative balance and four checks totaling $2,034.42 that had been returned because funds were not in the account. Klisares spoke with the fraud department and received copies of the entire bank account, including all deposits and checks. Klisares discovered WILLIAMS had written 32 checks to herself for a total of $12,300.00. WILLIAMS had also taken $360.00 in cash from three separate deposits. In addition, the account had been charged $101.81 by T-Mobile and $100.00 by Atmos Energy. She provided checking account records.

"3. On July 1, 2010[,] officers met with Klisares and the remaining committee members, Amy Foth, Georgia Jenkins, and Leah Barron. None could explain why WILLIAMS would write any checks to herself or why she had written the other checks. They all said that WILLIAMS had lied about the account's balance throughout the year and became defensive whenever they had asked. Most did not even know where the bank account was. They also said that after holding numerous fundraising events throughout the year, only a total of $428.60 in cash was deposited into the account between June[] 2009 and May[] 2010. After each fundraising event, WILLIAMS was responsible for taking the money to the bank [and] for keeping all records.

"4. Officers met with WILLIAMS on July 20, 2010. She denied taking any of the money for herself. She said she wrote checks to herself as the bank told her to do this for cash. She said it was easier to pay for everything in cash rather than write checks. WILLIAMS could not provide any proof of where the money went nor could she explain why almost no cash had been deposited into the account. She admitted paying her T-Mobile cell phone and Atmos Energy bills with funds from the account but said she was

9

only reimbursing herself for items she bought for Project Graduation. She told officers she would bring them all records and receipts but she never did."

On appeal, Williams first argues that the affidavit did not provide any evidence that Project Graduation was the "owner" of the money as defined in the Kansas statutes. Williams notes that the Kansas Criminal Code defines "owner" as "a person who has any interest in property" and "person" as "an individual, public or private corporation, government, partnership, or unincorporated association." See K.S.A. 2009 Supp. 21-3110(14)-(15). The parties agree that the State had to prove Project Graduation was the owner of the property and that to qualify as the owner, Project Graduation had to be "an individual, public or private corporation, government, partnership, or unincorporated association" with an interest in the property.

The State argues that Project Graduation is an unincorporated association and, therefore, falls under the definition of a person. In support of its argument, the State focuses on the dictionary definition of the term. Black's Law Dictionary 1765 (10th ed. 2014) redirects "unincorporated association" to "association." Among its definitions of "association" are "[a] gathering of people for a common purpose; the persons so joined" and "[a]n unincorporated organization that is not a legal entity separate from the persons who compose it." Black's Law Dictionary 148 (10th ed. 2014).

Based on those definitions, the State maintains that sufficient evidence supports concluding that Project Graduation was an unincorporated association. The State points to these key stipulations:
- That Williams was a co-chair of Project Graduation;
- That the police had met with the other committee members while investigating the allegations; and

10

- That Williams was a co-signer for the Project Graduation bank account, which was to be used to deposit donations and to pay for the school graduation party.

The State argues that a rational factfinder could reasonably conclude that the named victim—Project Graduation—was an unincorporated association that would fit within the legal definition of "person" because the evidence viewed in the light most favorable to the State establishes that it was a group organized for a common purpose.

Williams asks that we apply a different definition for the term unincorporated association—one from a Kansas statute repealed in 1972. Under the statute repealed in 1972, G.S. 1949, 17-2601[k], Williams argues, an unincorporated association was defined by statute to be one carrying on a business "for profit," something that wasn't true for Project Graduation. See *State, ex rel., v. United Royalty Co.*, 188 Kan. 443, 451, 363 P.2d 397 (1961) (quoting G.S. 1949, 17-2601[k]); L. 1972, ch. 52, sec. 153 (repealing G.S. 1949, 17-2601[k]).  Williams contends that we should use that definition because that definition is what the legislature "understood [the term] to mean when it enacted the definition of 'person.'" Williams argues that because nothing in the affidavit establishes that Project Graduation was carrying on business *for profit*, Project Graduation could not be considered an unincorporated association that would fit under the legal definition of "person." And if Project Graduation was not a "person," it could not be an "owner" for purposes of the theft statute. Thus, according to Williams, the State had failed to prove an essential element of theft as charged.

We do not find Williams' argument persuasive. Most importantly, there is no indication whatsoever that the legislature ever intended G.S. 1949, 17-2601[k], a definitional section in the General Corporation Code, to have any application to the state's criminal statutes. The provision was part of the General Corporation Code adopted in 1939, and the definition was to apply as the term was "used in [that] act." L. 1939, ch. 152, secs. 1, 6; G.S. 1949, 17-2401, 17-2601. It was repealed in 1972 when a totally

revised General Corporation Code, incorporating changes in Delaware corporate law (the standard used by most states), was adopted in Kansas. See 14 Treadway & Alderson, Vernon's Kansas Statutes Annotated: General Corporation Code iii-vii (1975). Additionally, in the case Williams cites in which this old, repealed statute was referenced, the case dealt not with any criminal liability but with the determination of which out-of-state business organizations had to comply with Kansas statutes for companies doing business in Kansas. See *United Royalty Co.*, 188 Kan. at 444-45, 460-61. For that purpose, it's understandable that the legislature chose only to make for-profit entities comply with those filing requirements, which resulted in a definition of unincorporated association that covered only for-profit unincorporated entities. That choice says nothing about whether—even at the time *United Royalty* was decided in 1961—a not-for-profit unincorporated entity could suffer the loss as a "person" for purposes of theft statutes.

But whatever the result may have been at some earlier time, Kansas law today does not limit use of the term unincorporated associations only to entities carrying on business for profit. See, *e.g.*, *Prime v. Beta Gamma Chapter of Pi Kappa Alpha*, 273 Kan. 828, 830-31, 47 P.3d 402 (2002) (classifying fraternity chapter as unincorporated association); see also K.S.A. 2015 Supp. 58-3934(c) and (n) (unclaimed property act defining "person" to include "business association," which includes unincorporated associations, whether for profit or not). Absent an express statutory definition or other indication, words of a statute should be given their ordinary meaning. *State v. Ultreras*, 296 Kan. 828, 850-51, 295 P.3d 1020 (2013). In ordinary usage, an unincorporated association could be either for profit or not—nothing in the terms "unincorporated" or "association" gives us any indication about whether the entity seeks to make a profit.

We conclude that an unincorporated association for the purposes of being a "person" under Kansas criminal law includes any gathering of people for a common purpose that does not have a separate legal identity. See Black's Law Dictionary at 148. The affidavit establishes that Project Graduation was a group organized as a committee

that was raising funds to throw the school's graduation party. The evidence is sufficient to establish that Project Graduation was an unincorporated association, so it was a "person" and qualified as the "owner" of the funds.

Williams next argues that the State failed to prove that she exerted *unauthorized* control over the money in the Project Graduation bank account. Based on *State v. Coburn*, 220 Kan. 750, 556 P.2d 382 (1976), Williams maintains that the State had to prove that Project Graduation had a "superior right of possession" in the funds to establish that she had exerted unauthorized control. A party with a "superior right of possession" has more of a legal claim to something—in this case, money—than the other parties claiming ownership.

In *Coburn*, a former sheriff was convicted of felony theft for keeping two pistols that had been given to him while he was serving as sheriff by a suspect and by the father of a suicide victim. He argued that his control over the pistols was authorized by the respective owners who did not want them and, therefore, that the State had failed to show he exercised unauthorized control. 220 Kan. at 754. The State reasoned that because the defendant had acquired the guns while serving in his official capacity as sheriff, the guns came into the possession of the public entity he represented—the county (through the sheriff's office). 220 Kan. at 754. The State maintained that because the county had the superior possessory interest, it was the owner. 220 Kan. at 754. The *Coburn* court agreed with the State, noting that historically the owner named in a theft prosecution "need not have legal title so long as he had the requisite superior right of possession." 220 Kan. at 755. The *Coburn* court discussed that "'[o]wnership of some form of possessory interest in someone other than the defendant is an essential element of [theft] and must be alleged and proved.'" 220 Kan. at 756 (quoting *People v. Sims*, 29 Ill. App. 3d 815, 817, 331 N.E.2d 178 [1975]).

13

According to Williams, the statement in the affidavit that the funds in the account were to be used to pay for the school graduation party is not sufficient to establish that Project Graduation had a superior right of possession or that the funds in the account could only legally be used for the graduation party. Williams argues that the State had to present documentation of some legally imposed limitations upon the funds in the account or of Project Graduation's governance that would demonstrate a person or body had a superior right of possession.

Williams also argues that merely using funds in an unexpected way does not make the use legally unauthorized. In support of that argument, she cites *State v. Kane*, 297 Mont. 421, 992 P.2d 1283 (1999). *Kane* involved a defendant who had a joint checking account with an elderly friend to help manage the friend's affairs; over the course of 2 to 3 years, the defendant transferred around $26,000 from the account to her personal account. The Montana Supreme Court concluded that the State had not established criminal theft because, under Montana law, co-owners of a joint bank account have an equal and unrestricted interest in the funds, so co-owners can never exercise unauthorized control or have a superior interest that would support theft charges, unless the joint account had been created through deception or threats. 297 Mont. at 423-24, 426.

This is a very different factual scenario from what took place in Williams' case. Here, there was a clear purpose for the funds placed in the Project Graduation Account— to "pay for the school graduation party." The Montana case cited by Williams, *Kane*, may be an outlier: Other states have concluded that a party to a joint account may be convicted of theft by unauthorized withdrawals and use of money from the account for purposes different than those agreed upon by the joint account holders. See, *e.g.*, *Wagner v. State*, 445 Md. 404, 434-36, 128 A.3d 1 (2015) (concluding defendant's use of funds from joint accounts constituted theft when defendant had violated agreement with victim that the funds would be used only on the victim's behalf); *State v. Gagne*, 165 N.H. 363, 370-72, 79 A.3d 448 (2013) (concluding sufficient evidence supported defendant's theft

14

conviction when victim testified that the purpose of the account was to allow the defendant to assist her in paying bills and that she had never authorized the defendant to make withdrawals for the defendant's personal use).

Sufficient evidence exists here to conclude that Williams exercised unauthorized control of the funds in the Project Graduation bank account. According to the affidavit, the account was "supposed to be used to deposit all donations and pay for the school graduation party." And Williams stipulated that was true in the diversion agreement. So in an account created to deposit donations for the graduation party and then to pay for the party, Williams wasn't authorized to use the funds for other purposes. See *State v. Anderson*, No. 103,484, 2011 WL 4563072, at *3 (Kan. App. 2011) (unpublished opinion) (noting that the facts suggested that the defendant might have been guilty of theft for writing checks on joint account with victim for personal use when the parties agreed that the account was only for the victim's expenses).

Of course, there was additional evidence of unauthorized use of the funds in the affidavit:

- When the other co-chair went to close the account, she discovered it had a negative balance and that Williams had written herself checks totaling over $12,000, had taken cash from deposits, and had used the account to pay personal bills. The other committee members could not explain why Williams had done so and told police that Williams had lied about the account's balance throughout the year.
- The committee members also noted that less than $500 in cash had been deposited into the account, despite many fundraisers during the year, and that Williams had been responsible for taking the money to the bank.
- Williams told police that she had written the checks out to herself for cash because it was easier to pay for everything in cash than to write checks, but she did not provide any records, receipts, or other proof of how the money was spent after

saying she would, and she could not explain why so little cash had been deposited into the account.

A rational factfinder could conclude that Project Graduation had a superior possessory interest in the funds in the account and that Williams was only authorized to use the funds for the graduation party.

Finally, Williams contends that to convict her of felony theft, the State had to prove that she had used at least $1,000 in funds for nonauthorized purposes. Williams maintains that the evidence only definitively shows that she spent approximately $200 on personal bills, which would only support a conviction for misdemeanor theft. See K.S.A. 21-3701(b)(5) (theft of less than $1,000 is a misdemeanor). But a conviction of even the most serious offense can be based entirely on circumstantial evidence. *Darrow*, 304 Kan. at 716 (noting that court does not ignore circumstantial evidence in stipulated facts because such evidence and reasonable inferences based on that evidence may be sufficient to support a guilty verdict). Viewing the evidence in the light most favorable to the State, a rational factfinder could reasonably infer that at least $1,000 in funds were used for unauthorized purposes based on the stipulated facts that the account had a negative balance, only a small amount of cash deposits were made when Williams was in charge of depositing them, and Williams had written more than $12,000 in checks to herself, paid $200 in personal bills out of the account, and taken over $300 in cash from deposits.

When viewing the evidence in the light most favorable to the State, sufficient evidence in the affidavit would support a conviction for felony theft.

Even so, because Williams was not properly advised of her right to a jury trial, the conviction is reversed, the sentence against Williams is vacated, and the case is remanded to the district court for further proceedings consistent with this opinion.

16